1
2
3
4
5
6
7        UNITED STATES DISTRICT COURT
8       SOUTHERN DISTRICT OF CALIFORNIA
9

| | |
|---|---|
| ANDREA A.,<br><br>                                    Plaintiff,<br><br>v.<br><br>ANDREW SAUL, Commissioner of<br>Social Security,<br><br>                                    Defendant. | Case No.:  19cv1873-BEN-MDD<br><br>**REPORT AND<br>RECOMMENDATION ON CROSS<br>MOTIONS FOR SUMMARY<br>JUDGMENT**<br><br>[ECF Nos. 14, 15] |

This Report and Recommendation is submitted to United States District Judge Roger T. Benitez pursuant to 28 U.S.C. § 636(b)(1) and Local Civil Rule 72.1(c) of the United States District Court for the Southern District of California.

Plaintiff Andrea A. ("Plaintiff") filed this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final administrative decision of the Commissioner of the Social Security Administration ("Commissioner") denying Plaintiff's application for Supplemental Security Income benefits

under Title XVI of the Social Security Act ("Act").  (AR at 11, 14)[1].  For the reasons expressed herein, the Court **RECOMMENDS** Plaintiff's Motion for Summary Judgment be **DENIED** and Defendant's Cross-Motion for Summary Judgment be **GRANTED**.

## I.   BACKGROUND

Plaintiff was born in March 1978.  (AR at 373).  At the time the instant application was filed on April 26, 2016, Plaintiff was 38 years old which categorized her as a younger individual.  20 C.F.R. § 404.1563, 416.963.

### A.   Procedural History

On April 26, 2016, Plaintiff protectively filed an application for supplemental security income under Title XVI of the Act, alleging a disability beginning January 1, 2010.  (AR at 373).  After her application was denied initially and upon reconsideration, Plaintiff requested an administrative hearing before an administrative law judge ("ALJ").  (AR at 11).  An administrative hearing was held on April 3, 2018.  (*See* AR at 247-59). Plaintiff appeared and was represented by attorney Christopher Reichman. (*Id.*).  Testimony was taken from Plaintiff and Bonnie Sinclair, an impartial vocational expert ("VE").  (*Id.*).  On August 30, 2018, the ALJ issued a decision denying Plaintiff's claim for supplemental security income.  (AR at 11-19).

On November 9, 2018, Plaintiff sought review with the Appeals Council. (AR at 490).  On July 27, 2019, the Appeals Council denied Plaintiff's request for review and declared the ALJ's decision to be the final decision of the Commissioner of Social Security in Plaintiff's case.  (AR at 1).  This timely

---

[1] "AR" refers to the Certified Administrative Record filed on February 11, 2020.  (ECF No. 12).

civil action followed.

## II. <u>DISCUSSION</u>

### A.   **Legal Standard**

Sections 405(g) and 1383(c)(3) of the Social Security Act allow unsuccessful applicants to seek judicial review of a final agency decision of the Commissioner.  42 U.S.C. §§ 405(g), 1383(c)(3).  The scope of judicial review is limited in that a denial of benefits will not be disturbed if it is supported by substantial evidence and contains no legal error.  *Id.*; *see also Batson v. Comm'r Soc. Sec. Admin.*, 359 F.3d 1190, 1993 (9th Cir. 2004).

Substantial evidence means "more than a mere scintilla" but less than a preponderance.  *Sandqathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997).  "[I]t is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Andrews v. Shalala,* 53 F.3d 1035, 1039 (9th Cir. 1995)).  The court must consider the record as a whole, weighing both the evidence that supports and detracts from the Commissioner's conclusions.  *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.2d 573, 576 (9th Cir. 1988).  If the evidence supports more than one rational interpretation, the court must uphold the ALJ's decision.  *Batson*, 359 F.3d at 1193.  When the evidence is inconclusive, "questions of credibility and resolution of conflicts in the testimony are functions solely of the Secretary." *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982).

Even if a reviewing court finds that substantial evidence supports the ALJ's conclusions, the court must set aside the decision if the ALJ failed to apply the proper legal standards in weighing the evidence and reaching his or her decision.  *Batson*, 359 F.3d at 1193.  Section 405(g) permits a court to enter a judgment affirming, modifying or reversing the Commissioner's decision.  42 U.S.C. § 405(g).  The reviewing court may also remand the

matter to the Social Security Administration for further proceedings. *Id.*

## B.    Summary of the ALJ's Findings

In rendering his decision, the ALJ followed the Commissioner's five-step sequential evaluation process. *See* C.F.R. § 404.1520. At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since April 26, 2016. (AR at 12).

At step two, the ALJ found that Plaintiff had the following severe impairments: postural orthostatic tachycardia syndrome; cervical spine, mild bulging; bilateral hips, mild degenerative changes; ankylosing spondylitis; asthma and other breathing problems; and a history of thyroid cancer status-post thyroidectomy in 2014. (AR at 13).

At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in the Commissioner's Listing of Impairments. (AR at 14) (citing 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926)).

Next, after considering the entire record, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform light work with the following limitations:

> [T]he claimant can lift and/or carry 20 pounds occasionally and 10 pounds frequently; the claimant can sit for 6 hours in an 8-hour workday with normal breaks; the claimant can stand and/or walk for 6 hours in an 8-hour workday with normal breaks; the claimant can occasionally perform postural activity; and the claimant should avoid hazards and pulmonary irritants.

(AR at 14).

The ALJ said that his RFC assessment was based on all the evidence and the extent to which Plaintiff's symptoms are consistent with the objective medical evidence and other evidence (*Id.*). The ALJ also stated that he

considered the opinion evidence in accordance with the requirements of 20 C.F.R. 416.927. (*Id.*).

The ALJ then proceeded to step four of the sequential evaluation process.  He found Plaintiff was able to perform her past relevant work. (AR at 17).  For the purposes of his step five determination, the ALJ found that Plaintiff's limitations had little to no effect on the occupational base of unskilled light work.  (AR at 18).  Accordingly, using the Commissioner's Medical-Vocational Guidelines as a framework for his decision-making, the ALJ determined that Plaintiff remained capable of performing unskilled light work that existed in significant numbers in the national economy.  (*Id.*).  The ALJ therefore found that Plaintiff was not disabled.  (*Id.*).

### C.    Issues in Dispute

The issues in dispute in this case are: (1) whether the ALJ erred in finding Plaintiff's mental impairments non-severe; (2) whether the ALJ erred in giving Mark Dilger, M.D.'s opinion less weight; (3) whether the ALJ erred in giving less weight to Manorama Reddy, M.D.'s opinion, and (4) whether the ALJ failed to develop the record.  (ECF No. 14-1).

### 1.    Mental Impairments

Plaintiff challenges the ALJ's decision regarding Plaintiff's mental impairments in two ways.  First, she contends the ALJ should have found her mental impairments were severe.  (*Id.* at 3).  Second, she argues the ALJ improperly accorded less weight to Dr. Dilger's opinion.  (*Id.* at 3-4).

### a.    Non-Severity Finding

At step two of the sequential analysis, the ALJ must determine whether the claimant has a medically determinable impairment, or combination of impairments, that is "severe."  The Commissioner defines a severe impairment as "[a]n impairment or combination of impairments . . . [that]

significantly limit[s] your physical or mental ability to do basic work activities" and lasted, or is expected to last, for a continuous period of at least 12 months. *See* 20 C.F.R. § 404.1522, 404.1520(a)(4)(ii). "Basic work activities" means the "abilities and aptitudes necessary to do most jobs," including, "understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine setting." 20 C.F.R. § 404.1522(b)(3)-(6).

"An impairment or combination of impairments may be found not severe only if the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work." *Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005) (citations and internal quotation marks omitted). If "an adjudicator is unable to determine clearly the effect of an impairment or combination of impairments on the individual's ability to do basic work activities, the sequential evaluation should not end with the not severe evaluation step." *Id.* at 687 (citation and internal quotation marks omitted). "Step two, then, is a *de minimis* screening device [used] to dispose of groundless claims, and an ALJ may find that a claimant lacks a medically severe impairment or combination of impairments only when his conclusion is clearly established by medical evidence." *Id.* (internal citations and internal quotation marks omitted).

The ALJ found that Plaintiff had non-severe mental impairments of depression, anxiety, and posttraumatic stress disorder. (AR at 13). In evaluating the severity of Plaintiff's mental impairments, the ALJ analyzed each of the four functional areas[2] that make up the paragraph B criteria and

---

[2] The first functional area is understanding, remembering, or applying information. The

concluded Plaintiff only had mild limitations in each.  (*Id.*).  Plaintiff claims that the ALJ erred in not finding her mental impairments to be severe based on Dr. Dilger's opinion.  (ECF No. 14-1 at 3-4).  Further, Plaintiff claims that the ALJ failed to consider treatment notes from psychiatrist Dr. Luisa Fijman.  (*Id.*).  Defendant argues that substantial evidence supports the ALJ's non-severity finding.  (ECF No. 15-1 at 10-16).

As an initial matter, Dr. Dilger ultimately opined that Plaintiff's "degree of functional impairment does not meet or equal a listing level severity" and that Plaintiff had "no significant psychological issues," despite having "some depression and anxiety symptoms" that were "showing improvement in treatment."  (AR at 277).  He noted that while Plaintiff had a depressed mood with irritable and anxious affect, her mental status examinations were "otherwise normal."  (AR at 271).  However, Dr. Dilger did find that Plaintiff had moderate limitations in difficulties in maintaining social functioning, and maintaining concentration, persistence, or pace.[3]  (AR at 271-72).

Conversely, the ALJ found Plaintiff had only mild limitations in interacting with others and in concentration, persistence, or pace.  (AR at 13).  The ALJ gave Dr. Dilger less weight because he assessed Plaintiff in 2016

---

second area is interacting with others.  The third functional area is concentrating, persisting, or maintaining pace.  The fourth functional area is adapting or managing oneself.  (AR at 13).

[3] Recent revisions to the Regulations regarding mental impairments, effective January 17, 2017, resulted in new paragraph B criteria.  *See* Fed. Reg. 66138-01, 2016 WL 5341732, at *661676 (Sept. 26, 2016).  The Regulations in effect changed while Plaintiff's application was pending before the Social Security Administration.  Dr. Dilger—who reviewed the records in 2016—evaluated Plaintiff's mental impairments using the B criteria set forth in the previous version of the listings.  (AR at 271-72).  However, the ALJ applied the revised version of the paragraph B criteria.  (AR at 13).

and the overall record at the time of the administrative hearing in April of 2018 showed only mild mental limitations.  (AR at 17).  The ALJ did not specifically cite any treatment or progress notes, but explained that Plaintiff's mental status examinations were "mostly unremarkable," that she was receiving non-emergency mental treatment, and that she received "limited treatment that included medications."  (AR at 13, 17).  The ALJ stated that "[t]here is no evidence of psychiatric hospitalizations, suicidal ideation, psychotic features or decompensations."  (AR at 13).

In the context of a claim under step two of the sequential analysis, the Court's inquiry focuses on whether the medical evidence clearly establishes that, during the relevant period, Plaintiff did not develop mental limitations that had "more than a minimal effect on" her ability to work for at least 12 continuous months.  *See Webb*, 433 F.3d at 686; 20 C.F.R. § 404.1522.  As detailed below, Plaintiff saw various medical professionals from October 2014 to May 2018 for her mental impairments.  These records support the ALJ's non-severity finding.

On October 15, 2014, Jennifer Jothen, DO, PC, noted that Plaintiff had "no depressive symptoms" and "no changes in thought content."  (AR at 1537).  On October 21, 2014, Plaintiff saw Dr. Zuhre N. Tutuncu and mentioned anxiety relating to her physical pain.  (AR at 1470).  Dr. Tutuncu recommended she "take it easy" and "not overdose on pain medication."  (*Id.*).  On October 29, 2014, Plaintiff saw Dr. Jeffrey A Sandler to obtain a refill on an anxiety medication.  (AR at 1835).  Dr. Sandler noted that Plaintiff has generalized anxiety disorder and has "chronically" required daily anxiety medication.  (*Id.*).  Plaintiff also saw her psychiatrist, Dr. Fijman, on October 29, 2014.  (AR at 746-51).  Plaintiff reported to her that she was more anxious and stressed out than normal due to multiple medical problems.  (AR at 747).

Dr. Fijman noted that Plaintiff was cooperative, had effective eye control, coherent speech, had a normal thought process, her judgment was "fair to good," and Plaintiff was mildly anxious. (AR at 749). She denied suicidal and homicidal ideations. (*Id.*). Dr. Fijman explained that Plaintiff had "no major disabilities based on [her] mental status exam." (*Id.*).

On December 2, 2014, Plaintiff requested a refill on her anxiety medication. (AR at 1821). On December 3, 2014, Plaintiff requested Dr. Fijman refill several of her prescriptions and indicated she was seeing a therapist. (AR at 746). On December 8, 2014, Plaintiff started taking Temazepam for anxiety. (AR at 1818).

On January 1, 2015, Dr. Fijman prescribed Adderall because Plaintiff was distracted and jumped from one task to the other. (AR at 743-44). On March 26, 2015, Plaintiff requested an appointment with Dr. Fijman because her Adderall prescription "fl[ew] out the window" and she needed another. (AR at 742). On April 29, 2016, Dr. Fijman noted that Plaintiff seemed to be in "good mood" and discussed the issue of controlled substances because Plaintiff claimed her Adderall prescription flew out the window. (AR at 740).

On June 29, 2015, Dr. Fijman noted that Plaintiff's affect was anxious, but her judgment was good and she denied suicidal and homicidal ideations. (AR at 739). On July 2, 2015, Plaintiff Saw Dr. Brunsting after experiencing a panic attack induced by anxiety. (AR at 1787). Dr. Brunsting suggested a follow-up exam. (*Id.*). On July 22, 2015, Dr. Fijman indicated that Plaintiff's mood and affect were sad and recommended she "put more effort" into "everyday life experiences" and "how they affect her." (AR at 736-37). She also recommended Plaintiff increase the frequency of appointments with her therapist. (*Id.*).

On August 24, 2015, Dr. Brunsting saw Plaintiff again. (AR at 1784-

86).  Plaintiff reported feeling stressed and overwhelmed, but denied suicidal or homicidal ideation.  (AR at 1784).  Dr. Brunsting recommended she continue with her current medications and follow up with psychiatry and a psychologist.  (*Id.*).  On September 9, 2015, Dr. Fijman noted that Plaintiff's mood was subdued.  (AR at 735).

On October 20, 2015, Plaintiff requested and received a Xanax refill from her primary care physician instead of Dr. Fijman.  (AR at 1779).  On October 21, 2015, Plaintiff told Dr. Fijman she was hospitalized recently. (AR at 732).  Dr. Fijman advised Plaintiff to "return to therapy" as soon as possible.  (*Id.*).  Dr. Fijman otherwise noted that Plaintiff "appear[ed] happy." (*Id.*).  On December 7, 2015, Dr. Fijman noted that Plaintiff' attention and concentration were intact and that she denied suicidal and homicidal ideations.  (AR at 729).

On February 3, 2016, Plaintiff reported to her primary care physician that she had been upset and crying for four days.  (AR at 1759).  She was told to continue with her medications and schedule a follow-up with psychiatry. (AR at 1758).  Plaintiff also saw Dr. Fijman on February 3, 2016.  (AR at 726-27).  Her mood was subdued and her affect was sad, but Dr. Fijman noted that her attention and concentration were intact and Plaintiff denied suicidal and homicidal ideations.  (AR at 727).  Dr. Puja Chitkara saw Plaintiff on February 8, 2016 and noted that her depression and anxiety were "flaring," but that Plaintiff denied suicidal or homicidal ideation.  (AR at 1506).  Dr. Chitkara spoke to Plaintiff's psychiatrist at length and noted that Plaintiff's depression may play a role in her arthritic pain.  (*Id.*).  Dr. Fijman saw Plaintiff two days later on February 10, 2016.  (AR at 725).  Dr. Fijman observed that Plaintiff's affect was subudued and her affect was mildly constricted.  (AR at 724).

On February 18, 2016, Plaintiff saw Dr. Brunsting for depression.  (AR at 1753).  Dr. Brunsting educated Plaintiff "regarding hospitalization as a treatment modality" and recommended she follow-up with him in three weeks.  (*Id.*). Plaintiff went to the emergency room the next day and explained that Dr. Brunsting recommended she come in.  (AR at 1664).  The emergency room doctor was unclear as to why Plaintiff was admitted because she was not suicidal, homicidal, or in any severe distress.  (*Id.*).  She was ultimately discharged a short time later.

On March 10, 2016, Plaintiff saw Dr. David Brunsting regarding posttraumatic stress disorder, anxiety, and depression.  (AR at 1748).  He noted that Plaintiff's symptoms improved with therapy and that she was feeling more hopeful.  (*Id.*).  On April 7, 2016, Dr. Chitkara noted that Plaintiff's depression and anxiety were "stable" and that she was seeing a new psychiatrist.  (AR at 175).  On May 2, 2016, Plaintiff reported to Dr. Bradley A. Eli that her anxiety and depression had increased.  (AR at 1504).  However, on May 12, 2016, Dr. Brunsting noted that Plaintiff's "chronic major depression [is] stable, especially in light of recent trauma in her life."  (AR at 2186).  He noted that she did not have suicidal or homicidal ideation and was to continue on her current medications.  (*Id.*).  Dr. Brunsting recommended she follow-up with him in two to three months.  (*Id.*).

On June 2, 2016 and June 16, 2016, Plaintiff was seen by Nurse Practitioner Kristin Preiser at Achieve Medical Center for depression, posttraumatic stress disorder, and anxiety disorder.  (AR at 1110-21).  On June 2, 2016, Plaintiff reported feelings of depression and anxiety and that it has been difficult for her to leave the house due to "significantly decreased motivation."  (AR at 1119).  Plaintiff stated that her sleep is interrupted and she has a decreased appetite.  (*Id.*).  She denied suicidal or homicidal

ideations. (*Id.*). On June 16, 2016, Plaintiff reported that "things have been crazy," but indicated she was taking less Xanax and was sleeping better with less nightmares. (AR at 1113). She reported feelings of depression at a "9/10," but "adamantly" denied suicidal or homicidal ideation. (*Id.*). Her mental status examinations on both days revealed no evidence of a cognitive impairment; her behavior was cooperative, friendly, well-related, and she had good eye contact; her speech was normal; her thought content was normal, her thought processes were linear, logical, future oriented, non-responsive to internal stimuli, and her reality testing appeared intact; her judgment was good and intact; and her impulse control was also intact. However, her mood was depressed and anxious and her affect was somewhat irritable and anxious, restricted ranging, but reactive and congruent with mood and thought content. (AR at 1113, 1120). At both appointments, Nurse Practitioner Preiser noted that Plaintiff was "able to be managed at current outpatient level of care." (AR at 1115, 1120). Dr. Brunsting also saw Plaintiff on June 16, 2016 for her anxiety disorder and noted that Plaintiff felt well with no specific complaints and that she was compliant with her medication. (AR at 2176).

Plaintiff reported to Dr. Brunsting that she saw psychiatrist Dr. Ivan Baroya on September 23, 2016, and that he told her to stop taking Xanax and to check into a detoxification program. (AR at 2018). She reportedly went to Sharp Memorial on September 24, 2016, was given Ativan and Dilaudid, and subsequently sent to "Mesa Vista BH." (*Id.*). However, Plaintiff felt mistreated there and left at 3am. (*Id.*). On September 25, 2016, Plaintiff went to Scripps Mercy Hospital for a "Xanax detox." (AR at 2028). Plaintiff stated she did not feel like hurting herself or others, but that that she had been crying without trigger and feeling depressed and "not right" for the past

three days.  (*Id.*).  Plaintiff further reported increasing emotional lability and crying for the last few weeks.  (AR at 2018).  She was discharged home and referred to Aurora, but Plaintiff felt that program was not appropriate for her because "she's not an addict."  (*Id.*).  Plaintiff saw Dr. Brunsting on September 30, 2016, who recommended she continue to follow-up with her psychologist and psychiatrist and to report to an outpatient detoxification program.  (AR at 2144).

On October 12, 2016, Plaintiff saw Dr. Brunsting to discuss her posttraumatic stress disorder with night terrors, major depression, and anxiety.  (AR at 2139).  Plaintiff reported that she was "in between psychiatrists" and was told that detoxifying from Xanax was not a good idea. (*Id.*).  On October 20, 2016, Dr. Chitkara noted that Plaintiff was "not currently seeing a psychiatrist."  (AR at 118).

On November 16, 2017, Plaintiff saw a Nurse Practitioner, who noted that Plaintiff's posttraumatic stress disorder was stable on current medication.  (AR at 2065).  On December 21, 2016, Dr. Chitkara noted that Plaintiff still was not currently seeing a psychiatrist and was receiving medication from her primary care provider.  (AR at 218).  Dr. Chitkara advised Plaintiff to "establish with [a] psychiatrist."  (*Id.*).  By May 8, 2018, Dr. Chitkara noted that Plaintiff was seeing a psychologist, but was "still having issues" with depression and anxiety.  (AR at 196).

Having carefully reviewed the objective medical evidence, the Court finds that it does clearly establish that Plaintiff did not have mental impairments that did, or were likely to, cause more than minimal limitations on her ability to perform any basic work activity for a continuous period of 12 months or more. *See Webb*, 433 F.3d at 686.  To the contrary, Plaintiff's treatment notes show that her mental status examinations were consistently

intact and that her mental impairments were generally well controlled with treatment.

### b.     Weight Accorded to Dr. Dilger

Plaintiff also challenges the weight accorded to Dr. Dilger's opinion because the ALJ's finding is not supported by substantial evidence and he did not consider any treating physicians' opinions.  (ECF No. 14-1 at 3-4). Defendant contends the ALJ's finding is supported by substantial evidence. (ECF No. 15-1 at 11-16).

The opinion of a non-examining physician, such as Dr. Dilger, may serve as substantial evidence if it is supported by other evidence in the record and is consistent with it.  *Andrews*, 53 F.3d at 1041.  Plaintiff essentially argues that Dr. Dilger's opinion that Plaintiff had moderate mental limitations is supported by substantial evidence and therefore the ALJ improperly accorded "less weight" to it.  (*See* ECF No. 14-1 at 3-4).  As discussed previously in great detail, the ALJ correctly found that the overall record at the time of the hearing—which included an additional 2 years of records—showed only mild mental limitations.  (*See* AR at 17).  As such, Dr. Dilger's opinion cannot serve as substantial evidence because it is not supported by the overall record and the ALJ correctly gave less weight to his opinion.  S*ee Andrews*, 53 F.3d at 1041; *see also Gallant v. Heckler*, 753 F.2d 1450, 1454 (9th Cir. 1984) (holding that a non-examining physician's opinion does not constitute substantial evidence when the opinion is contradicted by all other evidence in the record).

Plaintiff next contends the ALJ should have considered Dr. Fijman's opinion.  (ECF No. 14-1 at 4).  The ALJ did not discuss any treating medical opinions in his decision.  (*See* AR at 11-19).  The record in this case is over 2,000 pages long with records from several treating physicians.  (*See*

*generally* AR).  However, as detailed above, Dr. Fijman's treatment records do not contain opinions addressing what limitations in mental functioning Plaintiff experiences as a result of her symptoms.  (S*ee* AR at 725-51).  It was therefore not error for the ALJ to not consider any treating opinions with respect to Plaintiff's mental limitations.  *See Tamara N. v. Berryhill*, No. 3:17-cv-05840-TLF, 2018 WL 6804317, at *2-3 (W.D. Wash. Dec. 27, 2018) (finding no error where there were no treating or examining opinions and the ALJ relied on the plaintiff's treatment records to find mild limitations in mental functioning).

### 2.   Physical Impairments

Plaintiff argues the ALJ erred in according less weight to the opinion of Dr. Reddy, the only examining physician.  (ECF No. 14-1 at 5).  Further, Plaintiff contends the ALJ erred by not discussing any treating physicians' opinions.  (*Id.*).  Defendant contends the ALJ appropriately assigned less weight to Dr. Reddy's opinion.  (ECF No. 15-1).  Defendant did not address Plaintiff's argument regarding treating physicians.  (*See id.*).

### a.   Dr. Reddy

Plaintiff first argues that the ALJ erred by not giving controlling weight to the opinion of Dr. Reddy, a consultative examiner.  (ECF No. 14-1 at 5-6). Dr. Reddy's less than sedentary exertional capacity opinion is contradicted by Drs. Amado and Kanner, who opined that Plaintiff had a medium residual functional capacity.  (AR at 17).  An ALJ may reject the contradicted opinion of an examining doctor for "specific and legitimate" reasons supported by substantial evidence in the record.  *Trevizo v. Berryhill*, 871 F.3d 664, 675 (9th Cir. 2017).

Plaintiff was examined by Dr. Reddy on April 30, 2018.  (AR at 2198). Plaintiff was in a wheelchair and claimed she had been limited to a

wheelchair for 2 years, a walker for 2 years before that, and a cane for 2 years prior.  (AR at 2199).  Dr. Reddy reported that most of the medical history was obtained from Plaintiff and some from her medical records.  (*Id.*). Plaintiff's strength in all extremities was "5/5" and she had full range of motion in her cervical spine.  (AR at 2200).  Dr. Reddy could not examine Plaintiff's range of motion in her lumbar spine or hips because Plaintiff did not get out of her wheelchair.  (AR at 2201).  However, Dr. Reddy noted that Plaintiff had moderate tenderness and some stiffness in her lumbar spine, and mild-to-moderate tenderness present in her left hip.  (*Id.*).  Plaintiff experienced pain in both legs when Dr. Reddy conducted a straight leg test, which was "positive at 60 degrees."  (*Id.*).   Dr. Reddy assessed Plaintiff with a less than sedentary exertional capacity.  (AR at 2201-02).  While Plaintiff told Dr. Reddy that "she cannot walk at all and she can sit four hours without interruption and she can sit six hours total in [an] eight hour work day with 15 minute break[s] in between," Dr. Reddy opined that Plaintiff could stand for "maybe one hour" and could walk "maybe less than one hour."  (AR at 2201).  Dr. Reddy explained that the large number of medications that Plaintiff took were causing several side effects, possibly including her blackouts.  (AR at 2202).  Dr. Reddy opined that Plaintiff should stop taking many of the medications, some of which counteract each other.  (*Id.*).

The ALJ gave "less weight" to Dr. Reddy's less than sedentary exertional capacity because "it is not consistent with [Plaintiff's] upper and lower extremity strength, her overmedication with prescription medications, and the overall treatment record that does not support such restrictive exertional limitations."  (AR at 17).  In support, the ALJ points to normal x-rays and MRIs and notes that Plaintiff was prescribed several medications to treat her symptoms.  (AR at 16).  For example, Plaintiff's "x-rays repeatedly

show no abnormalities, including those of her right femur, right knee, right ankle, bilateral hips, cervical spine, lumbar spine, and bilateral shoulders" and "[t]he x-rays on December 28, 2015 of the claimant's bilateral hips showed stable mild degenerative changes." (AR at 16, 616-17, 755-64, 2157-60). Additionally, the ALJ noted that "[a]n MRI of the claimant's cervical spine on August 19, 2015, showed mild bulging at C5-C6." (AR at 16, 759). Further, the ALJ explained that Plaintiff's wheelchair use was not stated in earlier records. (AR at 17). As noted by Defendant, Plaintiff reported that she walked for exercise as late as December 5, 2017 and Plaintiff's use of a wheelchair is not otherwise indicated in the record. (AR at 2071).

In light of the inconsistencies between Dr. Reddy's less than sedentary exertional capacity outlined in Dr. Reddy's opinion, and Plaintiff's more benign treatment history, the Court concludes that the ALJ's decision to give Dr. Reddy "less weight" is based on specific and legitimate reasons supported by substantial evidence. *See Buck v. Berryhill*, 869 F.3d 1040, 1050 (9th Cir. 2017) (holding that an ALJ may properly reject the opinion that is inconsistent with the physician's own examination); *see also Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 602-03 (9th Cir. 1999) (holding that an ALJ may reject the opinions of a physician where the opinions are inconsistent with the overall record). The Court also concludes that the ALJ sufficiently summarized and detailed facts and conflicting evidence to support his findings. *See Embrey v. Bowen*, 849 F.2d 418, 421 (9th Cir. 1988) (finding that an ALJ must "do more than offer his conclusions" to reject an opinion as inconsistent with the overall record); *see also Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (finding the ALJ must "set[] out a detailed and thorough summary of the facts and conflicting evidence, stating his interpretation thereof, and mak[e] findings").

19cv1873-BEN-MDD

Plaintiff next argues that the ALJ did not appropriately consider the factors articulated in 20 C.F.R. § 404.1527 in deciding whether to give the opinion greater weight than the other medical evidence in the record.  (ECF No. 14-1).  The Ninth Circuit recently held that an opinion that is not controlling must be "weighted according to factors such as the length of the treatment relationship and the frequency of the examination, the nature and extent of the treatment relationship, supportability, consistency with the record, and specialization of the physician."  *Trevizo v. Berryhill*, 871 F.3d 664, 675 (9th Cir. 2017) (citing 20 C.F.R. § 404.1527(c)(2)-(6)).  An ALJ's failure to consider these factors "constitutes reversible legal error."  *Id.* at 676.  In assessing an ALJ's compliance with these factors, district courts must only consider "the ALJ's stated bases" for discounting the opinion and may not "look[] to the remainder of the record to support the ALJ's decision."  *Id.* at 677 n.4.  However, "*Trevizo* does not demand a full-blown written analysis of all the factors; it merely requires some indication that the ALJ considered them."  *Torres v. Berryhill*, No. 3:17-cv-01273-H-PCL, 2018 WL 1245106, at *5 (S.D. Cal. Mar. 9, 2018) (internal quotation marks and citations omitted) (collecting cases).  As such, the ALJ's decision must be affirmed if "the record sufficiently shows the ALJ considered the necessary elements.  *See id.* (internal quotation marks and citations omitted).

The ALJ did consider the necessary elements.  The nature and length treatment relationship were limited, as Dr. Reddy examined Plaintiff on one occasion and because Plaintiff did not get out of her wheelchair.  (AR at 16-17).  The ALJ acknowledged Dr. Reddy's specialization as a "Board certified physician."  (AR at 16).  Finally, the ALJ assessed the supportability and consistency of Dr. Reddy's opinion with the overall record.  (AR at 17).  For example, he noted that the less than sedentary exertional capacity was

19cv1873-BEN-MDD

inconsistent with Dr. Reddy's own finding of full lower and upper extremity strength and inconsistent with Plaintiff's repeated x-rays showing no abnormalities. (*Id.*)  The Court therefore concludes that the ALJ did not commit legal error in according Dr. Reddy's opinion less weight for failure to weigh the factors outlined in 20 C.F.R. § 404.1527.  In summation, the ALJ did not err in assigning "less weight" to Dr. Reddy.

### b.   Treating Physician Opinions

Next, Plaintiff argues the ALJ erred in not considering any treating physicians' opinions.  (ECF No. 14-1 at 5-6).  As discussed earlier, the ALJ did not discuss any treating medical opinions in his decision.  (*See* AR at 11-19).  The treatment records do not contain opinions addressing what limitations in physical functioning Plaintiff experiences as a result of her symptoms.  (S*ee generally*, *id.*).  The Court notes that Plaintiff refers to opinions proffered by physical therapists.  (ECF No. 14-1 at 5).  Medical opinions can only be issued by an "acceptable medical source."  20 C.F.R. § 404.1527(a)(1).  Physical therapists do not qualify as an "acceptable medical source."  20 C.F.R. § 404.1502(a); *see* SSR 06-03p, 2006 SSR LEXIS 5.  Additionally, only acceptable medical sources can be considered treating sources.  SSR 06-03p, 2006 SSR LEXIS 5.  Accordingly, there were no treating opinions to consider and therefore no error.[4]

//

---

[4] Further, as noted by Defendant, Plaintiff's physical therapists merely state that Plaintiff "has difficulty dressing, cooking and cleaning independently" as a historical reference. (AR at 517, 521, 525, 529, 533, 537, 541).  While in some cases it may be appropriate to give more weight to the opinion of an "other source," it is typically not appropriate to do so unless, for example, the other source provided better evidence and a better explanation for his or her opinion.  SSR 06-03p, 2006 SSR LEXIS 5, at *12-13.  Plaintiff's physical therapists' opinions do not fit this category.

19cv1873-BEN-MDD

### 3.  Development of the Record

Finally, Plaintiff argues the ALJ did not fully and fairly develop the record.  (ECF No. 14-1 at 6).  Plaintiff contends the ALJ admitted "that he [was] confused by the record and that he believe[d] that the record [was] incomplete."  (*Id.* at 7).  In support, Plaintiff points out that she submitted an additional 800 pages of medical records after the administrative hearing and the ALJ noted that they provided "little guidance" on her conditions.  (*Id.* at 6).  Additionally, Plaintiff explains that she told the ALJ at the administrative hearing that she had undergone 14 surgeries in the past 2 years and the ALJ noted that those surgeries could not be identified from the file.  (*Id.*).  Defendant contends that the ALJ's statements show that "the record failed to corroborate Plaintiff's testimony."  (ECF No. 15-1).

It is well established in the Ninth Circuit that the ALJ has a special duty to fully and fairly develop the record and to assure that the claimant's interests are considered, and that this special duty exists.  *Garcia v. Comm'r of Soc. Sec.*, 768 F.3d 925, 930 (9th Cir. 2014).  However, it remains the claimant's duty to prove that he/she is disabled.  *See Mayes v. Massanari*, 276 F.3d 453, 459 (9th Cir. 2001).  An ALJ's duty to develop the record further is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence.  *Id.*

Here, Plaintiff has failed to articulate her argument that the ALJ failed to develop the record.  Plaintiff asserts that her testimony at the administrative hearing that she underwent 14 surgeries in the past 2 years shows that the record is incomplete.  She likewise contends that the ALJ's statement that the additional 800 pages submitted after the hearing were of "little guidance" show an incomplete record.  Plaintiff is incorrect, these statements are not admissions of an incomplete record.  Rather, these

19cv1873-BEN-MDD

statements show that Plaintiff's statement regarding surgeries was unsupported by the record and that the additional 800 pages were of minimal relevance.  These statements do not constitute ambiguous evidence that supposedly triggered the duty to further develop the record.  Of import, Plaintiff does not argue additional medical evidence relating to her impairments existed but were omitted from the record.  (*See* ECF Nos. 14-1, 17).  Instead, her argument is premised on the misconception that the ALJ was "confused by the record" and believed "the record is incomplete."  (ECF No. 14-1 at 7).  Plaintiff also does not specify in what respects the record supposedly was inadequate to allow for proper evaluation of the evidence.  (*See id.*).

In any event, the Court finds that the ALJ fulfilled his duty to develop the record when he sent Plaintiff a pre-hearing notice instructing her to submit all evidence known to her that related to her disability claim and advising her of her right to request a subpoena for additional records (AR at 345), and when he acceded to Plaintiff's counsel's request to hold the record open following the administrative hearing to allow Plaintiff to submit additional medical records (AR at  11, 257-59).  *See Connor v. Colvin*, 674 F. App'x 629, 630 (9th Cir. 2017) (holding the ALJ satisfied the duty to develop the record where the ALJ sent notices prior to the hearing instructing the claimant to submit probative evidence and left the record open for 30-days post-hearing to give the claimant a chance to supplement the record); *Tidwell v. Apfel*, 161 F.3d 599, 602 (9th Cir. 1988) (holding that the ALJ satisfied any duty to develop the record by requesting additional records from claimant and her counsel, and by keeping post-hearing record open for supplemental medical evidence).  Accordingly, the Court finds that reversal is not warranted based on the ALJ's alleged failure to develop the record.

## III.  **CONCLUSION**

Based on the foregoing, the Court **RECOMMENDS** that the District Court **AFFIRM** the ALJ's decision finding Plaintiff not disabled and denying Supplemental Security Income, **DENY** Plaintiff's Motion for Summary Judgment (ECF No. 14), and **GRANT** Defendant's Cross-Motion for Summary Judgment (ECF No. 15).  This Report and Recommendation of the undersigned Magistrate Judge is submitted to the United States District Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(1) and Local Civil Rule 72.1(c) of the United States District Court for the Southern District of California.

**IT IS HEREBY ORDERED** that any written objection to this report must be filed with the court and served on all parties no later than **September 8, 2020.**  The document should be captioned "Objections to Report and Recommendations."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **September 15, 2020**.  The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

**IT IS SO ORDERED.**

Dated:   August 25, 2020

Hon. Mitchell D. Dembin
United States Magistrate Judge